UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

 Plaintiff,

vs. No. CR 21-568-MV

EVERETT E. PAQUIN,

 Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Mr. Paquin's Amended Opposed Motion to Amend Order of Detention, filed May 26, 2021. Doc. 26. The government filed a Response on June 2, 2021 [Doc. 29] and Mr. Paquin's Reply was filed on June 16, 2021 [Doc. 36]. Having carefully considered the Motions, relevant law, and being otherwise fully informed, the Court finds that Mr. Paquin's motion is well-taken and will be **GRANTED.**

## BACKGROUND

Mr. Paquin was allegedly involved in a physical altercation at Isleta Pueblo on December 31, 2020, during which he brandished a utility knife at Jane Doe, pushed her onto the ground, kneeled on her, and threatened her. Doc. 29 at 1. During the altercation, Mr. Paquin allegedly called his son, E.P., and said, "get over here, we're going to drag this bitch all over outside and we are going to kill her." *Id.* at 2. The government indicates that Jane Doe was later able to escape to a neighbor's house. *Id.*

On April 22, 2021, Mr. Paquin was indicted on three counts: Assault with a Dangerous Weapon, in violation of 18 U.S.C. §§ 1153 and 113(a)(3); Witness Tampering – Hindering, Delaying, or Preventing Communication Relating to Commission of Offense, in violation of 18 U.S.C. § 1512(a)(2)(C); and Felon in Possession of a Firearm and Ammunition, in violation of 18

1

U.S.C. §§ 922(g)(1) and 924.  Doc. 1.  Mr. Paquin was being held at Valencia County Detention Center when the indictment was returned; after his transfer to federal custody, he was brought before Magistrate Judge Jerry H. Ritter for a virtual initial appearance on May 20, 2021.  Doc. 6.

At the initial appearance, Mr. Paquin waived a detention hearing and was ordered detained. Doc. 34 at 5–6.  The government then requested that Magistrate Judge Ritter "order as a condition of detention no contact with Jane Doe or with defendant's son, directly or indirectly."  Doc. 34 at 6.  Defense counsel expressed "general concerns about conditions of detention."  *Id.*  After discussion of the rationale behind the government's request—namely, that Mr. Paquin's son E.P. was a witness to the charged conduct—Magistrate Judge Ritter ordered Mr. Paquin to (1) refrain from contacting the victim, except for investigative purposes, and (2) refrain from contacting his son, except through AFPD Hans Erickson about matters unrelated to the case.  *Id.* at 7–10. Magistrate Judge Ritter stated that "the primary purpose of these instructions is so the detention facility knows that they're not to enable Mr. Paquin to contact the alleged victim or the son."  *Id.* at 10.  Though these conditions were not published in any written order, both parties agree that Magistrate Judge Ritter's oral pronouncements control.  Doc. 26 at 2; Doc. 29 at 3 n.2.

Mr. Paquin argues that the Bail Reform Act only permits the court to impose conditions upon a defendant when he is released.  Doc. 26 at 2 (citing 18 U.S.C. § 3142(a), (i)).  The government agrees.  Doc. 29 at 4.  However, the government contends that the court has the inherent power to impose conditions of detention for the protection of victims and witnesses.  *Id.* at 4–7.  The government also argues that, in order to enforce the provision of the Crime Victims' Rights Act that gives victims a "right to be reasonably protected," the court "must be allowed to protect Jane Doe from communication and possible communication from Defendant."  *Id.* at 7 (citing 18 U.S.C. § 3771(a)(1)).  Mr. Paquin argues in his Reply that the facts of this case do not

justify the use of the court's inherent powers, pointing out that he has not interfered with the proceedings in any way and has not attempted to contact either E.P or Jane Doe. Doc. 36 at 2.

## STANDARD

### I. Statutory Authority to Impose No-Contact Condition of Detention

Other courts have rejected arguments that no-contact conditions of detention may be imposed under the Bail Reform Act or the Crime Victims' Rights Act. The Bail Reform Act's text only explicitly allows a court to enter a pretrial no-contact order in cases where the defendant has been released. *See* 18 U.S.C. § 3142(c)(1)(v). The statute is silent on whether courts may impose a similar condition during pretrial detention—or, indeed, whether courts may impose any conditions of detention at all. *Compare* 18 U.S.C. § 3142(c)(1) *with* (e). For this reason, other courts have found that the Bail Reform Act does not sanction no-contact orders imposed during pretrial detention. *See United States v. Sims*, No. 21-CR-26, 2021 WL 1062548, at *4 (D. Nev. Mar. 18, 2021); *United States v. Potter*, No. 3:20-MJ-00061, 2020 WL 6081894, at *3 (D.V.I. Oct. 15, 2020); *see also United States v. Streett*, 437 F. Supp. 3d 940, 951 (D.N.M. 2020) (Browning, J.). Similarly, the text of the Crime Victims' Rights Act "do[es] not appear, at least on [its] face, to vest the Court with any power to impose no-contact orders that may infringe on a defendant's First Amendment rights." *Sims*, 2021 WL 1062548, at *3.

A court might issue a pretrial no-contact order under 18 U.S.C. § 1514, which allows for the issuance of "a temporary restraining order prohibiting harassment of a victim or witness in a Federal criminal case." 18 U.S.C. § 1514(a)(1). However, as Judge Browning noted in *United States v. Streett*, the text of that statute constrains courts to issuing orders only when there are "reasonable grounds to believe that harassment . . . exists." *Streett*, 437 F. Supp. 3d at 947.

### II. Inherent Authority to Impose No-Contact Condition of Detention

3

Federal courts have "certain inherent authority to protect their proceedings and judgments in the course of discharging their traditional responsibilities." *Degen v. United States*, 517 U.S. 820, 820 (1996). Specifically, a federal court has inherent authority to control admission to its bar, to mete out punishment for the disobedience of court orders, to investigate potential fraud and vacate fraudulently obtained judgments, to bar disruptive criminal defendants from the courtroom, and to *sua sponte* dismiss for failure to prosecute. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–44 (1991). However, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Id.* at 44 (citation omitted). "A court's inherent power is limited by the necessity giving rise to its exercise." *Degen*, 517 U.S. at 829. Such powers "must be exercised with circumspection," and "only when and to the extent justified by danger which the defendant's conduct presents or by danger of significant interference with the progress or order of the trial." *Bitter v. United States*, 389 U.S. 15, 16 (1967). No Supreme Court decision has purported to include an exhaustive list of the courts' inherent powers; thus, the exact scope of these powers is unclear.

Several federal and state courts of appeal have upheld no-contact orders as an exercise of inherent powers in criminal cases. *See Wheeler v. United States*, 640 F.2d 1116, 1123 (9th Cir. 1981) (court had inherent authority "to protect victims and witnesses"); *Hicks v. State*, 377 P.3d 976, 979 (Alaska Ct. App. 2016) (same); *State v. Ayoub*, No. 218-2017-CR-1636, 2018 WL 324996, at *5 (N.H. Super. Jan. 5, 2018) (court had "inherent authority to protect the integrity of the fact-finding process"); *United States v. Morris*, 259 F.3d 894, 901 (7th Cir. 2001) (court had inherent authority "to protect the administration of justice"). The Tenth Circuit has not decided a case directly on point, although one recent case involved a challenge to a no-contact order applicable after sentencing. *See United States v. Grigsby*, 737 F. App'x 375, 377 (10th Cir. 2018).

The *Grigsby* Court's terse decision concluded only that the no-contact order was "a civil injunction pursuant to [the district court's] ancillary jurisdiction." *Id.* at 377. However, the *Grigsby* Court cited favorably to the Seventh Circuit's decision in *United States v. Morris*—implying, but not deciding, that the post-sentencing no-contact order was justified as an exercise of the district court's inherent power to protect the administration of justice. *Id.*

Despite the cases justifying no-contact orders as exercises of inherent power, federal courts have been clear that not *every* no-contact order should be upheld under this doctrine. *See, e.g., Morris*, 259 F.3d at 901 ("[T]he use of no-contact orders must be reserved for rare and compelling circumstances."). However, only the Ninth Circuit has articulated a clear standard to assess when an order has exceeded the court's authority. *See Wheeler*, 640 F.2d at 1124. In *Wheeler*, the Ninth Circuit considered a challenge to a post-sentencing no-contact order, holding that two conditions had to be met to sustain the order on remand. *Id.* First, "the activity restrained [must pose] a clear and present danger or a serious and imminent threat" and second, "the restraint must be narrowly drawn and no reasonable alternatives, having a lesser impact on First Amendment freedoms, must be available." *Id.* Other courts, such as the Fifth Circuit, have merely noted that the leading cases on this issue involve "credible claims of harassment that would interfere with the administration of justice" and reasoned that a no-contact condition in the absence of such harassment would "not implicate the administration of justice." *United States v. Darwish*, 755 F. App'x 359, 363 (5th Cir. 2018).

Other courts have applied the Ninth Circuit's *Wheeler* test to evaluate the validity of pretrial no-contact orders. *See Sims*, 2021 WL 1062548, at *4. In *United States v. Sims*, Mr. Sims was incarcerated pending trial on sex trafficking charges when he allegedly tried to contact two of his minor victims. *Id.* at *1. The government then asked for a court order explicitly barring him

5

from contacting four victims and limiting his contact with a fifth victim to "contact regarding his parent-child relationship with his biological child." *Id.* at *2. As in the instant case, the government argued that the order was a restriction incidental to a legitimate government purpose and therefore constitutional under *Bell v. Wolfish*, 441 U.S. 520 (1979). *Id.* The *Sims* Court disagreed that *Bell* provided the applicable standard, noting that *Bell* applied only to pretrial conditions of confinement that implicated the due process clause, *not* those that implicated the First Amendment. *Id*. at *3. The Court then determined that it had inherent authority to issue a no-contact order to protect victims and witnesses and that the applicable standard for exercising that authority was set out in *Wheeler*. Applying the *Wheeler* test, the *Sims* Court found that there was no "clear and present danger or serious and imminent threat to the victims" sufficient to justify the no-contact order; indeed, Mr. Sims had not harassed the victims in any way. *Sims*, 2021 WL 1062548, at *5. However, the government *had* demonstrated that Mr. Sims' contact attempts posed a serious and imminent threat to the administration of justice, because the evidence indicated that Mr. Sims had "repeatedly tried to get [the five] victims to recant their statements." *Id.* Ultimately, the court found that the order preventing contact with the victims was not drawn narrowly enough, and that there was a reasonable alternative that would have a lesser impact on Mr. Sims' First Amendment rights: ordering that he refrain from contacting the five victims *about his case. Id.* at *6. Thus, the court ordered that the government's motion for a no-contact order be granted in part and denied in part; Mr. Sims was ordered to have no contact with the five victims about matters related to his case. *Id.* at *7.

## DISCUSSION

This Court does not have the explicit textual authority to uphold the challenged condition of detention under either the Bail Reform Act or the Crime Victims' Rights Act. *See Sims*, 2021

6

WL 1062548, at *3–*4; *Potter*, 2020 WL 6081894, at *3; *Streett*, 437 F. Supp. 3d at 951. The government cites no authority in support of inferring such power. The Court will thus follow the weight of the persuasive precedent and decline to read into these statutes a provision authorizing the challenged condition of detention.

Nor can the no-contact order be upheld under 18 U.S.C. § 1514. While the government has not made such an argument, the Court finds it worth noting that the standard set out in that statute has almost certainly not been met. There are no reasonable grounds to believe that harassment of Jane Doe or E.P. currently exists, given that Mr. Paquin has not attempted to contact either of them since his incarceration. Doc. 36 at 2. Thus, this no-contact order cannot be justified as a civil action to restrain harassment. *Cf. Grigsby*, 737 F. App'x at 377.

The Court does, however, have the inherent authority to protect victims and witnesses. *See Wheeler*, 640 F.2d at 1123; *Hicks*, 377 P.3d at 979. Crucially, no court has found that this common law power has been constrained by statute; indeed, the Supreme Court has noted that it does not "lightly assume that Congress has intended to depart from established principles such as the scope of a court's inherent powers." *See Chambers*, 501 U.S. at 47 (citation omitted).

The Court is conscious, however, that "[a] court's inherent power is limited by the necessity giving rise to its exercise," and, in the absence of a controlling Tenth Circuit standard, elects to evaluate the challenged order under the Ninth Circuit's *Wheeler* test. *Degen*, 517 U.S. at 829. In doing so, the Court rejects the government's argument that *Bell* provides the correct standard. Doc. 29 at 5. As the *Sims* Court noted, *Bell* involved a challenge to conditions at pretrial detention facilities—namely, double bunking, the receipt of library books and packages, and the prison's search policy. *Bell*, 441 U.S. at 530, 548, 553, 558. Here, Mr. Paquin does not challenge physical conditions of confinement; nor does he complain of policies enacted by the pretrial

detention facility where he is housed. Though his motion addresses "conditions of detention," the crucial issue is one of judicial overreach in *his particular case*, not widespread suffering in his pretrial detention facility. Therefore, the Court finds that the *Bell* standard is ill-suited to address the issues in this case and declines to apply it.

Applying the *Wheeler* standard, this Court must ask (1) whether the restrained communications pose a clear and present danger or a serious and imminent threat to Jane Doe, E.P., or the administration of justice in general; and (2) whether the order is narrowly drawn such that no reasonable alternatives with a lesser impact on First Amendment rights are available. *See Wheeler*, 640 F.2d at 1124.

The current order, which prohibits Mr. Paquin from having any communication with Jane Doe except for investigative purposes, fails both prongs of the *Wheeler* analysis. The government has argued that this restriction is "reasonable due to the nature of this domestic violence assault," and noted that "Defendant and Jane Doe have no ongoing business, assets, or shared family interests . . . that would require further communication between them." Doc. 29 at 5, 7. However, there have been no allegations that Mr. Paquin has attempted to contact Jane Doe since the assault; nor is there any indication that Mr. Paquin *would* contact Jane Doe if given the opportunity. Thus, the evidence is insufficient to conclude that contact with Jane Doe would pose a clear and present danger to her or to the administration of justice. In addition, the order is not narrowly drawn: it prevents even hypothetical communication with Jane Doe that she may initiate about matters other than the case. As such, it is a great burden on Mr. Paquin's First Amendment rights and unjustified under *Wheeler*.

The current order also prohibits all communication with E.P. except for communications unrelated to the case and passed through Mr. Paquin's counsel. This prohibition similarly fails

both prongs of the *Wheeler* test.  The government has argued that the challenged restrictions are necessary to "prevent the potential for witness tampering."  Doc. 29 at 5.  Again, however, there is no indication that Mr. Paquin has attempted to influence his son's cooperation or testimony in this case.  And, again, the order is overly broad, as it instructs Mr. Paquin's counsel to serve as intermediary for all permitted communications.  If the government had been able to make the requisite showing that Mr. Paquin posed a clear and present danger to the administration of justice, the Magistrate Court could have narrowly addressed this danger by ordering that Mr. Paquin not communicate with his son *about the case*.  Such an order could have been strictly enforced, given the detention facility's ability to monitor Mr. Paquin's calls, mail, and visits.

Though federal courts have inherent power to protect victims and witnesses, the conditions of detention ordered in this case stretched beyond the court's inherent authority.  The conditions limiting Mr. Paquin's communications with Jane Doe and E.P. will thus be removed.  However, Mr. Paquin is advised that any attempt to harass or influence the testimony of Jane Doe or E.P. may not only lead to a re-imposition of the no-contact orders, but may also result in new charges for obstruction of justice.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Everett Paquin's Amended Opposed Motion to Amend Order of Detention is **GRANTED**.


ENTERED this 23rd day of September 2021.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE